```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                           EASTERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
      v.                           )     No. 4:09 CR 51 DJS
                                   )                     DDN
 LAVAUGHN SCOTT,                   )
                                   )
            Defendant.             )
```

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on March 24, 2009.

Defendant LaVaughn Scott has moved to suppress evidence and statements. (Doc. 16.) From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law.

### FACTS

1. During the evening hours of December 30, 2008, St. Louis Metropolitan Police Officer Michael Langsdorf and his partner, Officer Barry, were on patrol in the College Hill neighborhood of St. Louis in an unmarked police car.[1] Two other officers, Cornell and Thurman, patrolled with them in another unmarked police car. The officers were members of the police Most Violent Offenders Unit. While the Officers were not wearing full police uniforms, they were wearing tactical vests with the word "Police" printed on them, so that they would be easily recognized as police officers.

2. Around 8:04 p.m. Officers Langsdorf and Barry saw a green Ford Taurus pull over to the sidewalk in front of 4428 Strodtman. A black man, later identified as LaVaughn Scott, got out of the Taurus and began talking with a younger person on the sidewalk. Although they saw

---

[1]The officers had information that firearms activity and narcotic trafficking were occurring in that area.

Scott adjust his waistband, the officers did not see him do anything illegal or unusual. Other persons remained in the Taurus. After seeing the driver of the Taurus get out and begin speaking with the bystander, the officers parked their vehicles and got out. Officers Langsdorf and Barry walked over to Scott to find out who he was and what he was doing in the area.[2] When they saw the officers approach, the sidewalk bystander fled,[3] but Scott stayed where he was. The officers did not chase the fleeing bystander. While Officers Langsdorf and Barry spoke with Scott, the other two officers went to the Taurus and spoke with the passengers.

3. In response to the officers' questions, Scott willingly provided his name, date of birth, and social security number. At the time, the officers did not have their guns drawn and did not search Scott. A computer check confirmed the information Scott gave the officers and they learned that there were five outstanding arrest warrants for him. The officers immediately placed him under arrest on the outstanding warrants, handcuffed him, and searched his person. When Officer Langsdorf lifted up his t-shirt, he found a firearm in his waistband. Langsdorf seized the weapon and immediately made it safe to handle. When the officer found the gun, without being asked any question, Scott stated words to the effect that "I can't go to jail for this. I am on probation for robbery. I'll go to the feds for this." Officer Langsdorf then told Scott he was under arrest for the unlawful use of a weapon and for carrying a concealed weapon.

4. Next, Officer Langsdorf orally advised Scott of his constitutional rights to remain silent and to counsel. Scott said he understood his rights. When the officer asked where he got the gun, the defendant's only statement was that, if they were going to lock him up, he was not going to tell the officers anything.

5. The officers also searched the Taurus. No contraband was found. The officers also arrested and searched the Taurus passengers

---

[2]At this time the officers did not have any weapon drawn.

[3]To Officer Langsdorf, it was common for bystanders to run off when police approached.

on outstanding arrest warrants, but did not find anything suspicious. Because Scott did not own the Taurus, the owner was contacted and came and retrieved the vehicle.

6. After the arrest, the officers took Scott to the police station and placed him in an interview room. Scott declined to make any further statements.

## **DISCUSSION**

Defendant Scott argues that the seizure of the firearm from his person was unconstitutional and that his statements to the police were acquired illegally. The undersigned disagrees.

To determine whether the officers' initial encounter with defendant, in which he identified himself, was limited by the Fourth Amendment, the court must consider the totality of the specific circumstances. United States v. Griffith, 533 F.3d 979, 983 (8th Cir. 2008). The issue is whether or not the whole encounter indicated the police acted in a way that would indicate to a reasonable person that his freedom of movement was restricted. Id. In deciding that issue, the court should look at whether the officers positioned themselves to limit defendant's freedom of movement, the number of officers present, whether the officers displayed any weapon, whether an officer physically touched defendant, whether defendant's property (such as a driver's license) was retained by the police (thus limiting defendant's ability to leave), or whether an officer indicated to defendant that he was suspected of criminal activity. Id.

After considering these factors the undersigned concludes that the officers obtained defendant's identification from him in a consensual encounter and not through a limitation of his freedom of movement that implicated the Fourth Amendment. Assuming defendant saw both that two officers (Langsdorf and Barry) walked up to him on the sidewalk and that two other officers walked over to the Taurus to speak with its remaining occupants, no evidence indicated that the placement of the officers occurred in a fashion intended by the police to prevent defendant from leaving the area. No evidence indicated that the number of officers present was intended for more than the officers' safety, given the evening time of day and the dangerousness of the neighborhood. No

officer displayed any weapon.  No evidence indicated that any officer physically touched defendant until he was later placed under arrest the first time.  No evidence indicated any of his property was kept by the officers during the initial encounter.  And no officer told defendant during the initial encounter that he was suspected of criminal activity.  Under these factual circumstances, the officers acquired defendant's identity lawfully, not in violation of the constitution.

The same facts that indicated that defendant was not in custody when he provided his identification information also indicate that he provided this information voluntarily, without coercive activities by the officers.  Dickerson v. United States, 530 U.S. 428, 433 (2000).  The issue of voluntariness *vel non* requires consideration of the totality of the circumstances to determine whether or not the defendant's free will was overridden.  Id. at 434-35.  As stated, defendant's statements to the police were not coerced; his free will to decide not to cooperate was not overridden by the actions of the police.

Having lawfully acquired defendant's identity and background information, the officers learned of the arrest warrants for him and lawfully arrested him.  Because they lawfully arrested him, the officers were constitutionally authorized to search defendant without a warrant. United States v. Robinson, 414 U.S. 218, 226 (1973); United States v. Jones, 535 F.3d 886, 891 (8th Cir. 2008); United States v. Johnigan, 90 F.3d 1332, 1336 (8th Cir. 1996)(lawful warrantless search incident to lawful arrest during consensual encounter).

In finding and seizing the firearm from defendant's person, the police acquired more information supporting probable cause to arrest him, this time for firearms laws violations. Following this discovery, defendant made a spontaneous, unsolicited statement (words to the effect of "I can't go to jail for this.  I am on probation for robbery.  I'll go to the feds for this.") This statement should not be suppressed because it was made without police coercion and was volunteered by defendant.  United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005).

Following the second formal notification that he was under arrest, the officer orally advised defendant of his constitutional rights to remain silent and to counsel, which defendant said he understood.

The next issue presented to the court is whether defendant's post-*Miranda* statement in response to the officer's question (words to the effect that, if they were going to lock him up, he was not going to tell the officers anything) should be suppressed as an invocation of his right to remain silent. When an arrested person invokes his right to remain silent, the law is reasonably clear and well established:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

<u>Michigan v. Mosely</u>, 423 U.S. 96, 100 (1975) (quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 473-74 (1966)). Pretty clearly, defendant indicated he did not want to speak with the officers. When he was asked about the gun, knowing his right to remain silent or to waive this right, defendant chose to invoke this right, ostensibly because the police had determined to take him into custody. He invoked his right to remain silent both on the scene of the arrest and at the police station.

For these reasons,

**IT IS HEREBY RECOMMENDED** that the motions of defendant LaVaughn Scott to suppress physical evidence and statements (Doc. 10 oral, and Doc. 16) be sustained only as to the statement described in Finding 4, above, and denied in all other respects.

**IT IS HEREBY ORDERED** that the motion of the United States for a determination of the admissibility *vel non* of any arguably suppressible evidence (Doc. 11 oral) is sustained. Said determination is set forth above.

The parties are advised the have ten days to file written objections to this Report and Recommendation. The failure to file timely, written objections may waive the right to appeal issues of fact.

/S/    David D. Noce
                              **UNITED STATES MAGISTRATE JUDGE**

Signed on April 1, 2009.